**PREMIUM TOBACCO STORES, INC.,** a California corporation d/b/a Cigarettes Cheaper; The Pop Broker, Inc., a Colorado corporation; and Young Shim Kim d/b/a MJ Sales Co., Plaintiffs,

v.

**Fred FISHER, Executive Director, Department of Revenue, State of Colorado in his official capacity, Defendant.**

No. 99–K–869.

United States District Court, D. Colorado.

June 11, 1999.

Craig B. Shaffer, Joanne Herlihy, Dufford & Brown, P.C., Denver, CO, Matthew J. Fairshter, Joel R. Bennett, Fairshter & Associates, Pasadena, CA, for plaintiffs.

Ken Salazar, Attorney General, Neil L. Tillquist, Assistant Attorney General, Office of Attorney General, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

KÅNE, Senior District Judge.

### I. *Background.*

This is a constitutional challenge to two Colorado statutes (C.R.S. §§ 39–28–104.5 and 39–28.5–111) enacted by the state on March 24, 1999. Plaintiffs in this case are Premium Tobacco Stores, a California corporation selling cigarette and tobacco products, The Pop Broker, a Colorado corporation selling soft drinks and cigarettes, and Young Shim Kim, a Colorado citizen selling cigarettes. All three Plaintiffs participate in some aspect of the sale of "repatriated" cigarettes in Colorado. Federal question subject matter jurisdiction exists under 28 U.S.C. § 1331 and venue is proper under 28 U.S.C. § 1391(b).

A portion of cigarettes manufactured in the United States is produced and labeled

for export sales to other countries. The federal labeling requirements and taxes on these cigarettes are more lenient than those imposed on cigarettes intended for domestic sales. After leaving this country, some of the exported cigarettes are imported back into the United States after their packaging is made compliant with federal rules for domestic sales and the appropriate excise taxes are paid. These repatriated cigarettes are then distributed and sold in the United States in discount retail outlets.

The discount available on these cigarettes has increased to between four and nine dollars per carton (composed of ten individual packages) of cigarettes. This discount on repatriated cigarettes is made possible by the recent settlement reached between the various states and the tobacco companies in what is known as the Master Settlement Agreement (the "MSA"). The M.S.A. § contains a volume adjustment plan designed to induce the tobacco companies to reduce domestic cigarette consumption. Under the MSA, the payment obligations of each tobacco company is tied to the number of cigarettes shipped within the United States. The volume adjustment plan then allows for a decrease in money owed to the states by each cigarette manufacturer as the companies' domestic shipment of cigarettes decreases. Cigarettes labeled for export are not counted in the definition of cigarettes shipped in the United States. As such, repatriated cigarettes provide a means of keeping Colorado cigarette supplies steady while simultaneously showing a decrease in the number of cigarettes shipped in the United States. This provides the potential for tobacco companies to keep supply steady while reducing their payment obligations under the MSA.

The sale of repatriated cigarettes has come to be known as "gray market sales" due to the somewhat dubious means by which these cigarettes find their discount, and the statutes in question here are referred to by both parties and the legislature as "Gray Market Statutes." These refer to Colorado Revised Statutes § 29–28–104.5 (1999) pertaining to cigarettes and § 29–28.5–111, directed to other tobacco products. The two Colorado statutes were enacted in response to this loophole created by the MSA. The Gray Market Statutes take advantage of the federal label requirements on cigarettes produced for export, requiring these cigarettes to bear a label stating they are "manufactured for use outside of the Unites States." The statutes make the sale, or offer to sell, packages of cigarettes so marked illegal in Colorado. Additionally, the statutes are violated if the state tax stamp is affixed to these packages or if the federal export marking on these packages is concealed in any way. Violation of these statutes is a class 1 misdemeanor.

Section 29–28–104.5 declares any package of cigarettes found in the State of Colorado marked as "manufactured for use outside of the United States" contraband subject to seizure and destruction by the Colorado Department of Revenue. By preventing the sale and distribution of these repatriated cigarettes, the state is attempting to assure all cigarettes and tobacco products sold in Colorado are contributing to the tobacco settlement funds.

Defendant Fred Fisher is the Executive Director of the Colorado Department of Revenue, is charged with administering and enforcing the provisions of the two statutes. On March 25, 1999, agents from the Department of Revenue confiscated packages of repatriated cigarettes from a retail store in Littleton, Colorado, and on March 31, 1999, agents confiscated cigarettes from two other retail outlets in Denver, Colorado, namely Moon Liquor and 14th Street Liquor.

The exact number of cartons and packages confiscated from each location is disputed by the parties, but in each case, the cigarettes had been previously taxed and stamped in compliance with the state laws existing before the enactment of the Gray Market Statutes. Additionally, The Pop Broker and Young Shim Kim have had to remove and discontinue the sale of their

inventory of repatriated cigarettes, and refund the purchase price of the confiscated cigarettes to the different raided retail outlets. Plaintiffs allege they will continue to suffer financial effects from the enforcement of the challenged statutes. They bring this constitutional challenge alleging that the state statutes violate the Supremacy Clause, the Commerce Clause, the Contract Clause, the Due Process Clause, and the Equal Protection Clause of the United States Constitution.

## II. Standards for Preliminary Injunction.

Because the circumstances in which a court may grant a preliminary injunction are not described by Federal Rule of Civil Procedure 65(a), the denial of a preliminary injunction is a matter of discretion for the court. The most compelling reason for entering a preliminary injunction is to prevent the judicial process from being rendered futile by the actions of the defendant. 11a Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 3d* § 2947 (1998). Thus, the function of a preliminary injunction is to preserve the *status quo* in order for the court to render a meaningful decision on the merits of the case. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). The policies underlying this idea have been expanded into four prerequisites which the moving party must establish: (1) substantial likelihood the movant will eventually prevail on the merits; (2) a showing the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Id.*

## III. Merits of the Motion for Preliminary Injunction.

Plaintiffs seek a preliminary injunction, This is an extraordinary remedy requiring that I invoke equitable powers to grant an injunction before hearing this case on the merits. To warrant such remedy, Plaintiffs must carry the considerable burden of persuasion, particularly here, where state statutes are challenged in federal court. Indeed, the policies underlying the reluctance of the federal judiciary to intervene in the affairs of state government referred to as "Our Federalism," were aptly articulated by the Supreme Court in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny. *Younger* states:

This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as "Our Federalism," and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of "Our Federalism." The concept does not mean blind deference to "States' Rights" any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States. It should never be forgotten that this slogan, "Our Federalism," born in the early struggling days of our Union of States, occu-

pies a highly important place in our Nation's history and its future. *Id.* at 44, 91 S.Ct. 746.

█ The purpose of an injunction is to preserve the *status quo,* and it may not issue if it will disturb the *status quo.* Plaintiffs argue the preliminary injunction sought in this case should be granted to "reinstate the *status quo* that existed prior to March 24, 1999 when the sale of repatriated cigarettes in the State of Colorado was lawful." (Pl.s' Br.Supp.Mot. Prelim. Inj. at 23.) That, however, is not the *status quo* at issue in this case. In this instance, the Colorado legislature has enacted state statutes criminalizing the ownership and distribution of what it considers to be a threat to the health and safety of its citizenry. These state statutes carry a high presumption of validity for many of the reasons articulated in *Younger.* As such, the *status quo* at this time is the state's enforcement of its own statutes. Plaintiffs seek to have the federal court overturn the *status quo* against the presumption of validity of these statutes because they are unconstitutional and contrary to federal policy. While the underlying principles of "Our Federalism" initially impose a high burden of persuasion on the plaintiff seeking a preliminary injunction against the enforcement of state criminal statutes in federal court and the plaintiff does not seek to enjoin a pending state criminal proceeding, the notion that federal policy is available to trump state action is beyond consideration. With this imposing burden of persuasion in mind, I examine the four prerequisites Plaintiffs must establish, as articulated in *Lundgrin.*

1. *Likelihood of Success on the Merits.*

A. *Commerce Clause.*

█ Plaintiffs claim the statutes are *per se* violations of the "dormant" Commerce Clause because they impermissibly benefit in-state economic interests by burdening out-of-state competitors, thereby discriminating against interstate commerce. (Pl.s' Br.Supp.Mot. Prelim. Inj.

at 8.) In addition to expressly empowering Congress to regulate commerce among the states, the Commerce Clause impliedly limits the states' power to burden interstate commerce. *Blue Circle Cement, Inc. v. Board of County Comm'rs,* 27 F.3d 1499, 1511 (10th Cir.1994). In this way the dormant Commerce Clause denies " 'the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce.' " *Id.* (quoting *Oregon Waste Systems, Inc. v. Department of Envtl. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). The Constitution, however, "when conferring upon Congress the regulation of commerce ... never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 443–44, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960).

Plaintiffs argue Congress recognized cigarette and tobacco products form an integral part of interstate commerce by passing the Federal Cigarette Labeling and Advertising Act of 1965. (Pl.s' Br. Supp.Mot. Prelim. Inj. at 8.) Plaintiffs also point to language taken from testimony in the House Floor Debate on the statutes stating the bill is necessary to protect the state's settlement monies. (*Id.* at 10.) They maintain the challenged statutes benefit in-state tobacco distributors and retailers at the expense of out-of-state competitors, thereby creating an economic barrier protecting long-standing Colorado businesses against competition from new distributors and retailers dealing in repatriated tobacco products. (Pl.s' Reply Mem.Supp.Mot. Prelim. Inj. at 13–14.)

█ Defendants argue the state statutes do not discriminate against interstate commerce because they ban the sale of all repatriated tobacco products. Thus, the statutes affect out-of-state distributors and in-state distributors equally. (Def.'s Resp. Opp.Mot. Prelim. Inj. at 9.) In fact, the

Plaintiffs consist of two Colorado residents and one California resident, all of whom have been prevented from distributing repatriated tobacco products in Colorado.

Plaintiffs argue, however, Colorado has entered into a private contract (the MSA) with cigarette manufacturers under which the state benefits financially by increasing the sales of cigarettes. (Pl.s' Reply Mem. Supp.Mot. Prelim. Inj. at 18.) By prohibiting the sale of repatriated cigarettes, Plaintiffs argue the state is protecting its own in-state economic gains under the contract by eliminating the sale of a competing product moving in interstate commerce. This misconstrues the Commerce Clause argument.

The M.S.A. § was designed to decrease the sale of tobacco products, particularly to minors, by increasing the retail price of these products, regardless of where the tobacco products originated. As such, the statutes eliminate the sale of tobacco products at greatly reduced prices made possible by a loophole in the contract. The prohibition of these sales includes products made by the identical cigarette manufacturers with whom the state has contracted under the MSA. Indeed, Plaintiffs have not shown Colorado consumers will replace the banned cigarettes with cigarettes made by in-state producers. The repatriated cigarettes will, in all likelihood, be replaced by the identical tobacco product originally shipped into the state via the domestic market and therefore under the auspices of the M.S.A. § cost shifting scheme. This results in the substitution of the identical product albeit at a higher price.

To the extent the Colorado consumer is faced with a higher price for the same product, that is the exact intent of the MSA, with the underlying goal of deterring the overall sale of tobacco products, regardless of their origin. In this way, the challenged statutes evenhandedly regulate all retailers from selling repatriated cigarettes in Colorado without regard to whether the retailer is in-state, out-of-state, a party to, or not party to, the MSA. Therefore, I find Plaintiffs have not discharged their considerable burden of showing a likelihood of success on the merits of their Commerce Clause challenge.

### B. *Supremacy Clause.*

Plaintiffs next argue the statutes violate the Supremacy Clause of the Constitution because the state regulation of cigarette distribution is preempted by the federal Cigarette Labeling and Advertising Statutes, 15 U.S.C. § 1331, *et seq.* (Pl.s' Br. Supp. Mot. Prelim. Inj. at 12.) In considering the question of preemption of state statutes related to matters of health and safety, the Supreme Court has stated

It is a familiar and well-established principle that the Supremacy Clause invalidates state laws that "interfere with, or are contrary to," federal law. Under the Supremacy Clause, federal law may supersede state law in several different ways. First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. In the absence of express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. Pre-emption of a whole field also will be inferred where the field is one in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." We have held repeatedly that state laws can

be pre-empted by federal regulations as well as by federal statutes.

*Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (citations omitted). The Cigarette Labeling and Advertising Statutes state in relevant part: "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b). Plaintiffs argue this provision preempts the state's ability to regulate the field of cigarette labeling and advertising and the challenged statutes intrude on these federal regulations by declaring tobacco products labeled as manufactured outside the United States to be contraband subject to seizure by the Colorado Department of Revenue. (Pl.s' Br. Supp. Mot. Prelim. Inj. at 14.) This misconstrues the express language of the federal statute which prohibits state laws interfering with federal regulations relating "to the advertising or promotion of any cigarettes." The state's ability to declare packages of cigarettes marked in compliance with the federal packaging requirements as contraband is not intrusive on the advertising or promotion of these cigarettes and is therefore not precluded by the Supremacy Clause.

Consistent with the Court's statement in *Hillsborough County,* Plaintiffs also argue federal regulation of tobacco products is so comprehensive it is reasonable to infer Congress' intent to preempt all state law on the same subject. (Pl.s' Br. Supp. Mot. Prelim. Inj. at 14.) They cite a litany of federal statutes regulating the foreign purchase of American made cigarettes, repatriation of these cigarettes under customs law, the federal guidelines assuring compliance with cigarette labeling requirements, and the payment of an excise tax on the repatriated cigarettes. (*Id.* at 15.) From this scheme, Plaintiffs argue it can reasonably be inferred Congress has preempted the field of regulation concerning the lawfulness of tobacco products. (*Id.* at 16.)

In making this argument, Plaintiffs must overcome the presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause. *See Hillsborough County,* 471 U.S. at 715, 105 S.Ct. 2371.

 Here, the state is attempting to further the health and safety of its citizenry by prohibiting the sale and distribution of repatriated tobacco products it believes effectively undermine the cost shifting and reduction of teenage smoking goals of the MSA. Plaintiffs must therefore show either implicit preemption of the whole field of tobacco distribution, or a direct conflict between the challenged statutes and the federal scheme that is strong enough to overcome the presumption that state regulation of health and safety matters can constitutionally coexist with federal regulation. *Id.* at 716, 105 S.Ct. 2371.

 As described by Plaintiffs, the federal regulations detail the procedures with which an importer must comply to bring cigarettes into the country. These regulations assure the imported cigarettes can pass through U.S. Customs by displaying the Surgeon General warning label and payment of the appropriate excise tax. Nothing in these regulations implies congressional intent to occupy the entire field of cigarette distribution or consumption within the states, nor do the challenged statutes prohibiting the distribution of cigarettes in Colorado conflict directly with federal laws regulating their entry into the United States. As such, Plaintiffs have not shown a likelihood of succeeding in the necessary showing of express or implied preemption by the federal statutes or a direct conflict between the statutes and federal law.

### C. *Equal Protection Clause.*

Plaintiffs next argue the statutes violate the Equal Protection Clause by discriminating between "individuals based upon unreasonable, arbitrary or capricious differences that are irrelevant to a legitimate

governmental objective." (Pl.s' Br. Supp. Prelim. Inj. at 17.) This argument is based on Plaintiffs' characterization of the statutes as arbitrarily distinguishing between repatriated cigarettes and cigarettes produced for the domestic market for no legitimate governmental reason. (*Id.*)

This constitutional challenge is reviewed under the rational basis test. Thus, to prevail on the merits, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). To do so, Plaintiffs would have to show the state cannot articulate any legitimate objective that is furthered by enactment of the challenged statutes. The state articulated many health and safety goals as a basis for entering into the M.S.A. § with tobacco companies. Although these goals may not now, nor ever be met by the provisions of the MSA, the wisdom of the state legislature's means of meeting these goals is not open to review by the federal courts. The state's desire to curb youth smoking and to shift the health related costs of smoking onto the smoking public are legitimate governmental objectives. It is reasonable for the state legislature to believe these objectives would be furthered by enacting the challenged statutes, effectively closing what the state believes to be a loophole in the MSA. As stated in a quite different context by Justice Holmes: "It is the usual last resort of constitutional arguments to point out shortcomings of this sort. But the answer is that the law does all that is needed when it does all that it can, indicates a policy, applies it to all within the lines, and seeks to bring within the lines all similarly situated so far and so fast as its means allow." *Buck v. Bell,* 274 U.S. 200, 208, 47 S.Ct. 584, 71 L.Ed. 1000 (1927). Given this reasoning for enacting the challenged statutes and the lenient standard of review, Plaintiffs have not shown a likelihood of their prevailing on the Equal Protection challenge.

### D. *Contract Clause.*

Finally, Plaintiffs claim the statutes are unconstitutional under the Contract Clause as they force distributors of repatriated cigarettes to undo settled sales contracts with retail outlets. (Pl.s' Br. Supp. Prelim. Inj. at 18.) In *Energy Reserves Group, Inc. v. Kansas Power and Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), the Court articulated a three-step test for evaluating Contract Clause challenges. A court must first inquire whether there has been a substantial impairment of a contractual relationship. *Id.* at 411, 103 S.Ct. 697. If so, the state must demonstrate it has a significant and legitimate public purpose which is served by the statute. *Id.* at 412, 103 S.Ct. 697. The state must then show adjustment of the rights and responsibilities of contracting parties is based on reasonable conditions and is of a character appropriate to the public purpose. *Id.*

Without providing any contract for the record, Plaintiffs allege the challenged statutes impermissibly interfere with contracts existing between themselves and various retailers and retail outlets providing for the supply of repatriated cigarettes. Following the enactment of the statutes and the confiscation of the cigarettes from the different retail outlets, Young Shim Kim was required to refund the sales price of those cigarettes to the retail outlets affected. (Pl.s' Br. Supp. Prelim. Inj. at 18.) Without the benefit of examining the relevant contract, it is unclear what contractual terms were adjusted to cause Young Shim Kim to refund the price of tobacco products confiscated after delivery to a retail outlet. *Id.* Assuming arguendo the existence of a contractual clause requiring the Plaintiff to warranty the delivered cigarettes against confiscation, the challenged statutes could be described as substantially impairing a contractual relationship.

The state, however, has demonstrated a significant and legitimate public purpose for the prohibition against repatriated to-

bacco products in the health and cost shifting goals of the MSA, protected by the challenged statutes. Additionally, the state's adjustment of the Plaintiffs' rights to sell a product deemed dangerous to the health of its citizenry by prohibiting the further sale and distribution of that product is appropriate to the public purpose. Indeed, as the state points out, if state legislatures were prohibited from interfering with any contractual right based on such limited allegations, they could rarely, if ever, enact social or economic legislation. (Def.'s Resp. Opp. Mot. Prelim. Inj. at 9.) Thus, Plaintiffs have not shown the likelihood of success on the Contract Clause challenge.

### 2. *Irreparable Injury.*

■ Plaintiffs must demonstrate an irreparable injury or potential harm that would impair a court from granting an effective remedy at trial if an injunction does not issue. *See* 11 Wright & Miller, *Federal Practice and Procedure* § 2948.1 (1998). The Pop Broker and Young Shim Kim are suffering harm from the termination of their distribution of gray market cigarettes. The Pop Broker has lost fifty percent of its business and Young Shim Kim's business consisted solely of selling repatriated cigarettes. (Pl.s' Br. Supp. Prelim. Inj. at 5.) Continued enforcement of the statutes will cause substantial economic hardship to The Pop Broker and the complete loss of Young Shim Kim's business. Even if a loss were compensable by an award of money damages, the risk that The Pop Broker and Young Shim Kim will become insolvent before a judgment can be collected satisfies the irreparable harm requisite for a preliminary injunction.

### 3. *Balance of Hardships.*

■ I must also examine the corresponding burden to Defendant should the injunction issue. *See* 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.2 (1998). Here the state's interest is balanced against Plaintiffs' potential harm if an injunction does not issue. The state has a legitimate,

long range interest in protecting the tobacco settlement it entered into with the tobacco companies by closing a loophole that allows cigarette manufacturers to keep supply steady while decreasing their monetary obligations under the agreement. While this might be a source for draining revenue from the agreement in the future, there is no showing that the state's revenues have been decreased thus far. Indeed, the cigarettes confiscated were legally purchased and brought into the state before enactment of the statutes that make this activity illegal. Although the state has a legitimate interest in closing this loophole in the MSA, it is unlikely to suffer any appreciable decrease in the tobacco settlement revenues before this case may be heard on the merits. Balancing the Plaintiffs' loss in business against the state's potentially insignificant loss in revenue, the balance of hardships lies with the Plaintiffs.

### 4. *Public Interest.*

■ This final factor is a way of inquiring if policy considerations bear on whether the order should issue. 11a Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 3d* § 2948.4 (1998). It is frequently emphasized that the public interest in the issuance of an injunction should be given considerable weight. Here, the public interest is declared in the very statutes challenged by the Plaintiffs.

■ The state entered into the M.S.A. § in the public interest of non smokers who must bear the social costs of smoking. The agreement functions to transfer the cost of smoking related illness back onto the cigarette manufacturers who then pass it onto the consumers of their products via price increases. The ability of the different sellers of repatriated cigarettes to continue selling discounted cigarettes under the MSA, harms the public interest in two ways. First, it harms the non smoking public by frustrating the cost shifting mechanism of the MSA. Second, it harms

the smoking public by allowing it to continue consuming cigarettes without confronting the full social cost of the smoking habit. The state legislature has determined the public interest is served by forcing smokers to pay for the full cost of their smoking as this results in lower costs to the non smoking public and a decrease in the amount of smoking due to the increased cost. The distribution of inexpensive cigarettes that do not pay into the cost shifting scheme frustrates this public interest. Thus, Plaintiffs have not shown the injunction, if issued, would not be adverse to the public interest.[1]

### IV. *Conclusion.*

Plaintiffs have not carried the burden of showing a likelihood of success on the merits nor that the extraordinary relief sought would not be adverse to the public interest. Thus, notwithstanding a showing of irreparable harm to Plaintiffs and a balance of hardships in their favor, I deny the motion for preliminary injunction. Accordingly,

IT IS ORDERED THAT Plaintiffs' Motion for Preliminary Injunction is DENIED.

---

1. The state also asserts repatriated cigarettes are often of inferior quality to those produced for domestic distribution. (Def.'s Br. Opp'n Prelim. Inj at 6.) It argues the continued distribution of gray market cigarettes further militates against the public interest as consumers of the repatriated cigarettes may be confused in purchasing the inferior product, expecting to receive the similarly packaged product made for the domestic market. Plaintiffs deny this is the case, asserting the cigarettes manufactured for export are identical to those for domestic use. (Pl.s' Reply Mem. Supp. Mot. Prelim. Inj. at 8). As neither side presents persuasive evidence in this regard, I do not weigh this potential factor in analyzing the public interest.