PTI, INC., et al., Plaintiffs,

v.

PHILIP MORRIS INCORPORATED,
et al., Defendants.

No. CV 99–8235 NM (EX).

United States District Court,
C.D. California.

May 25, 2000.

1182

Joel R. Bennett, Matthew J. Fairshter, Timothy L. Hayes, Bennett & Fairshter, Pasadena, CA, for plaintiffs.

John Joseph Quinn, Jr., James F. Speyer, John D. Lombardo, Arnold & Porter, Los Angeles, CA, Mark R. Merley, Douglas L. Wald, Michael Yeh, Mark J. Montano, Anne M. Walker, Arnold & Porter, Washington, DC, for Philip Morris Inc., R.J. Reynolds Tobacco, Inc.

Tony L. Richardson, Adam Joshua Chester, Los Angeles, CA, Peter A. Bellacosa, Kirkland & Ellis, New York City, for Brown & Williamson Tobacco Corp. and Lane Limited.

Jeffrey M. Shohet, Maria R. Acker, Gray, Cary, Ware & Freidenrich, San Diego, CA, Jeffrey S. Nelson, Joseph A. Lanahan, Shook, Hardy & Bacon, Kansas City, MO, for Lorillard Tobacco Co.

Gouglas L. Carden, Floey & Lardner, Los Angeles, CA, Bernard J. Rosenthal, Gilbert, Segall & Young, New York City, for Japan Tobacco Int'l USA, Inc.

Robert E. Boone, III, Jennifer A. Jackson, Bryan Cave, Santa Monica, CA, Robert W. Shely, Rodney W. Ott, Phoenix, AZ, for Lignum–2, Inc.

P. John Owen, William M. Modrcin, Morrison & Hecker, ZKansas City, MO, Meryl Macklin, Cohen & Grigsby, Pittsburg, PA, John W. Amberg, Adam J. Thurston, Santa Monica, CA, for The Medallion Co., Inc. and Premier Marketing, Inc.

Donald S. Urrabazo, Proskauer Rose, Martha E. Gifford, Los Angeles, CA, for Societe D'Nationale D'Exploitation Industrialle Des Tabacs Et Allumettes.

Bruce L. Ishimatsu, Santa Monica, CA, Bradford C. Berge, Campbell, Carr, Berge & Sheridan, Santa Fe, NM, for Santa Fe Natural Tobacco Co., Inc.

John Y. Yoon, Lee & Hong, Los Angeles, CA, Robert J. Lane, Jr., Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY, for Kingmaker Marketing, Inc.

Dennis Eckhart, CAAG–Office of Atty., General of Calif., Sacramento, CA, Emily B. Myers, Nat'l Assoc. of Attys. General, Washington, DC, for Nat'l Assoc. of Atty. Generals.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

MANELLA, District Judge.

### I

### Introduction

In November 1998, the five major domestic tobacco companies [1] entered into a contract, termed the Master Settlement Agreement ("MSA"), with representatives of forty-six states, the District of Columbia, and five territories.[2] Pursuant to the MSA, the states agreed to dismiss their pending suits (or to refrain from filing suit) against the tobacco companies in exchange for yearly payments, to be used to defray health costs from smoking-related illnesses and to fund smoking prevention programs. *See* M.S.A. § at 2. This suit is one of a series of legal challenges to the M.S.A. § and statutes passed in conjunction with it. To date, these suits have been uniformly unsuccessful.[3]

1. The major domestic tobacco companies are Philip Morris, Inc.; R.J. Reynolds Tobacco, Inc.; Brown & Williamson Tobacco Corp; Lorillard Tobacco Co., and Liggett Group.

2. Florida, Minnesota, Mississippi, and Texas independently settled with the tobacco manufacturers prior to the date the M.S.A. § was signed. The participating territories were American Samoa, Guam, the Northern Marianas, Puerto Rico, and the Virgin Islands. *See* Exh. D to Ps' FAC at S–1 to S–26. For the sake of convenience, this order collectively refers to the states, the District of Columbia, and the territories as "the states."

3. *See Premium Tobacco v. Fisher,* 51 F.Supp.2d 1099 (D.Colo.1999); *Hise v. Philip Morris, Inc.,* 46 F.Supp.2d 1201 (N.D.Okla. 1999), *aff'd mem.,* 2000 WL 192892 (10th Cir.

Plaintiffs in the instant dispute are entities engaged in the business of cigarette re-entry and/or importation of cigarettes into the United States. *See* First Amended Complaint ("FAC") ¶¶ 12–20. They deal in "repatriated" cigarettes, defined as those produced domestically for sale abroad that are later imported back into the United States, and "gray market" cigarettes, defined as those produced abroad for sale in foreign markets by domestic cigarette manufacturers that are later imported into the United States. On August 13, 1999, plaintiffs filed this suit against the tobacco companies who had signed the M.S.A. § (designated in the Complaint as Original Corporate Defendants, or "OCDs," and Subsequent Participating Manufacturers, or "SPMs"), alleging violations of federal antitrust laws, the Constitution, and various state laws. After both the state defendants and the private defendants filed motions to dismiss the complaint, plaintiffs filed a First Amended Complaint February 1, 2000. The FAC again alleged violations based on antitrust, constitutional, and state law. The private defendants and state defendants filed the instant motions to dismiss March 3, 2000.

## II

## Factual Summary

According to the M.S.A. § recitals, more than 40 states commenced litigation against the tobacco companies seeking monetary, equitable and injunctive relief. Those states that had not yet filed such a suit had the potential to do so. *See* M.S.A. § at 1. Citing the importance to both the states and the tobacco manufacturers of "reducing underage tobacco use by discouraging such use and by preventing [y]outh access to [t]obacco [p]roducts," the

Feb.17, 2000); *A.D. Bedell Wholesale Co. v. Philip Morris, Inc.,* 104 F.Supp.2d 501 (W.D.Pa.2000); *Forces Action Project LLC v. California,* 2000 WL 20977 (N.D.Cal. Jan.5, 2000).

**4.** The statute defines a tobacco product manufacturer as an entity that (a) manufactures

settling states and the participating manufacturers agreed to the MSA. *Id.* at 2. Under the MSA, the states agreed to dismiss their litigation against the tobacco companies in exchange for guaranteed payments, which the states would use for health care costs and to initiate various public health measures. The tobacco companies also agreed to certain restrictions on their advertising and promotional activities. *See* M.S.A. § § III.

The FAC begins with the declaration that plaintiffs "seek to invalidate the Master Settlement Agreement." FAC ¶ 1. The bulk of the complaint focuses on a challenge to two related statutes that many signatory states have enacted, referred to in the FAC as the Qualifying Statute and the Model Act. The Qualifying Statute— sometimes referred to as the "Escrow Statute"—applies to "tobacco product manufacturers," [4] and aims to ensure "that the state will have an eventual source of recovery from them if they are proved to have acted culpably." Cal. Health & Safety Code § 104555(f) (West 1999). The statute requires those who decide not to join the MSA—designated Non–Participating Manufacturers ("NPM")—to make annual payments, based on the manufacturer's annual sales, into an interest-earning escrow account. *See, e.g., id.* § 104557 (West 1999). The escrow funds are to be used to pay any judgment or settlement of claims brought against the manufacturer. *See, e.g., id.* § 104557(b). The amount paid into the account is not to exceed the amount the tobacco product manufacturer would owe if it elected to join the MSA; if a manufacturer is able to show that its payment exceeds "the state's allocable share of the total payments that the manufacturer would have been required to

cigarettes intended for sale within the United States, or (b) is the first purchaser of cigarettes designated for sale abroad that intends to sell the cigarettes in the United States. *See, e.g., id.* § 104556(i). Thus, it applies to plaintiffs in this action.

make" under the MSA, the manufacturer is entitled to the excess. *Id.* § 104557(b)(2). If, after 25 years, the funds have not been used, they revert to the manufacturer. *See, e.g., id.* § 104557(b)(3). States have a financial incentive under the M.S.A. § to pass the Qualifying Statute: the amount of money they receive from the settlement fund is significantly reduced if the state has not passed a Qualifying Statute, or if the statute has been struck down by a court of competent jurisdiction. *See* M.S.A. § § IX(d).[5]

The Model Act—also referred to as the "Gray Market Statute"—is not specifically mentioned in the MSA. The Model Act bans repatriators from importing cigarettes labeled "For Export Only," "U.S. Tax Exempt," "For Use Outside U.S.," or with similar wording. *See, e.g.,* Cal. Rev. & Tax.Code § 30163(b) (West 1999). The statute is an attempt to ensure that products created specifically for overseas use are not brought into the United States.[6] "By preventing the sale and distribution of these repatriated cigarettes, the state is attempting to assure all cigarettes and tobacco products sold in [the state] are contributing to the tobacco settlement funds." *Premium Tobacco Stores, Inc. v. Fisher,* 51 F.Supp.2d 1099, 1102 (D.Colo.1999). To date, many—but not all—of the states have passed a version of the Model Act.[7]

The FAC refers to several groups of defendants: the OCDs and cigarette manufacturers and distributors who later joined the M.S.A. § are collectively denominated the "participating manufacturers"; all state officials involved in the negotiation of the M.S.A. § (mostly current or former state attorneys general) are termed the "politician defendants"; and

the officials in charge of enforcing the states' versions of the Model Act are referred to as the "agency defendants." The FAC also names the National Association of Attorneys General ("NAAG") as a defendant.

Plaintiffs allege that all defendants have violated federal and state antitrust laws. *See* FAC ¶¶ 343–376. They also allege that, through their enactment of Qualifying Statutes and Model Acts, the politician defendants and agency defendants (collectively referred to as the "state defendants") have violated a number of constitutional provisions: the Interstate Compact Clause, the prohibition against bills of attainder, the Commerce Clause, the Import–Export Clause, the Supremacy Clause, the First Amendment, the Equal Protection Clause, and the Due Process Clause. The FAC contends that these constitutional violations amount to a violation of 42 U.S.C. § 1983 on the part of the politician defendants in their individual capacities. Plaintiffs seek declaratory, injunctive and equitable relief, as well as damages for the alleged antitrust and § 1983 violations. Finally, they include three claims under California state law: a violation of the Unfair Competition Act (Cal. Bus. & Prof.Code §§ 17200 et seq.), intentional interference with prospective business advantage, and trade libel and disparagement. They seek injunctive relief for the Unfair Competition Act claim and damages for the other two. Defendants argue that all claims should be dismissed.

### III

#### Legal Standard

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the

---

**5.** Despite this incentive, counsel stated at oral argument that not all participating states have passed a Qualifying Statute.

**6.** The parties dispute whether the Model Act directly tracks the legislative and administrative scheme created in 26 U.S.C. §§ 5704(d), 5754(a), and 64 Fed.Reg. 71,918, 71,921 (1999). Regardless of whether the statutes

overlap, the Model Act does not directly contradict the federal scheme, as discussed below.

**7.** At the time plaintiffs filed the FAC, 23 states had passed versions of the Model Act. *See* FAC ¶ 225.

complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1998). The court must deny the motion unless it appears that plaintiffs can prove no set of facts that would entitle them to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *SEC v. Cross Financial Services, Inc.,* 908 F.Supp. 718, 726–27 (C.D.Cal. 1995). When evaluating a Rule 12(b)(6) motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *See Barron v. Reich,* 13 F.3d 1370, 1374 (9th Cir.1994). However, the court is not bound to assume the truth of legal conclusions merely because they are stated in the form of factual allegations. *See Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). Dismissal is proper if a complaint is vague, conclusory, and fails to set forth any material facts in support of the allegation. *See North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 583 (9th Cir.1983). Plaintiffs bear the burden of pleading facts sufficient to state a claim; courts will not supply essential elements of a claim that were not initially pled. *See Richards v. Harper,* 864 F.2d 85, 88 (9th Cir.1988). The court may consider materials properly submitted with the complaint when deciding a motion to dismiss. *See Hal Roach Studios v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 (9th Cir.1989).

## IV

### Jurisdictional Issues

#### A. *Jurisdiction Over the Non–California State Defendants*

Plaintiffs premise jurisdiction over all state defendants on the theory that, as signatories to the MSA, the states derive pecuniary benefit from every pack of cigarettes sold in every state, including California. By subjecting itself to the terms of the agreement, this theory goes, each state defendant purposefully availed itself of the privilege of conducting activities in every other state. At least one court has previously rejected this theory. *See Forces Action Project,* 2000 WL 20977, at *7 (finding the M.S.A. § did not create personal jurisdiction over Utah and its Attorney General in a California court). Plaintiffs have the burden of establishing that jurisdiction exists. *See AT & T v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996). However, to survive a motion to dismiss based on lack of jurisdiction, plaintiff is only required to make a prima facie showing of jurisdiction. *See Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995).

It is well-settled that a state may assert personal jurisdiction over a nonresident defendant only to the extent allowed by the Due Process Clause. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (citing *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1877)). Due process, in turn, requires that a defendant have certain minimum contacts with the forum state, so that the defendant has fair warning of the possibility of suit in a foreign jurisdiction, and may reasonably anticipate being forced to defend itself there. *See id.* at 414, 104 S.Ct. 1868; *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267, 270 (9th Cir. 1995). The minimum contacts requirement may be met in two ways: through general jurisdiction, requiring that the defendant has conducted "substantial, or continuous and systematic," activities within the forum state, *Omeluk,* 52 F.3d at 270; and through specific jurisdiction, requiring that the controversy have arisen out of defendant's actions within the forum state, *see id.*

■ Plaintiffs allege that this forum has both general and specific jurisdiction over all state defendants. The general jurisdiction argument is easily disposed of. As noted above, general jurisdiction requires continuous and systematic contacts with the forum. *See Ziegler,* 64 F.3d at 473. The M.S.A. § creates a system under which a small fraction of the amount paid on every cigarette package goes to a central fund, which is later distributed to the states. This fund disbursement structure, alone, is woefully insufficient to establish that each state has the necessary continuous and systematic contact with California to warrant general jurisdiction. *Cf. Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 438, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952) (general jurisdiction found when foreign corporation kept files, held directors' meetings, and carried on correspondence in Ohio); *see also Helicopteros,* 466 U.S. at 414–15, 104 S.Ct. 1868; *AT & T,* 94 F.3d at 587–88 (finding no specific jurisdiction over a European parent corporation of a company that caused environmental damage in California). This court has no general jurisdiction over the non-California state defendants.

■ Plaintiffs also contend that by virtue of signing the MSA, each of the settling states and territories has created specific jurisdiction in California. In the Ninth Circuit, the existence of specific jurisdiction is determined using a three-part test: defendants must have purposefully availed themselves of the forum state, invoking the protections of the state's laws; plaintiffs' claims must arise directly out of defendants' activities in the forum state; and exercise of jurisdiction must be reasonable. *See Omeluk,* 52 F.3d at 270. Under the specific jurisdiction test, plaintiffs have not shown that this court has specific jurisdiction over the non-California state defendants.

■ Attenuated contacts with the forum state are not sufficient to show purposeful availment. *See Omeluk,* 52 F.3d at 270. Instead, "the defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Sinatra v. National Enquirer,* 854 F.2d 1191, 1195 (9th Cir.1988). Such conduct must be specifically "aimed at, and having effect in, the situs state." *Ziegler,* 64 F.3d at 473. The other member states do not enforce the M.S.A. § in California: they do not oversee tobacco sales in California; they do not enforce the advertising and promotional restrictions imposed by the agreement; and they do not supervise the payment of funds into the general settlement fund. The non-California state defendants may receive money from the general fund in return for settling their own suits against the participating tobacco companies and agreeing to enforce compliance with the M.S.A. § within their borders, but plaintiffs cannot show that merely by signing the MSA, each member state took the necessary *affirmative* steps to transact business in every other member state. As the Supreme Court has held, "[F]inancial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that State." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 299, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

No such "constitutionally cognizable contact" exists here. *Id.*[8] State officials en-

---

8. Even if plaintiffs could show that the state defendants reasonably availed themselves of the benefits and protections of California, and that this purposeful availment led directly to plaintiffs' claims, the court would be required to determine whether jurisdiction over the state defendants is reasonable. Reasonableness is determined through the use of a seven-factor test, which examines: (1) the extent of purposeful injection into the forum; (2) burdens on the defendant from litigation in the forum; (3) conflict with the sovereignty of defendant's state; (4) the forum's interest in adjudicating the dispute; (5) efficiency; (6) importance of the forum to plaintiff's interest in expeditious relief; and (7) existence of an

force the M.S.A. § themselves. NAAG provides the states with the opportunity to apply for funds to aid in their enforcement efforts, but does not serve as an independent force to police the agreement. The fact that a state may apply to NAAG for discretionarily apportioned enforcement funds is not tantamount to purposefully availing itself of the benefits and protections of all other states. *Cf. Forces Action Project,* 2000 WL 20977, at *7 ("[D]oes Utah's signing of the M.S.A. § constitute Utah's purposeful availment of the rights and privileges of California according to *International Shoe Co.* and its progeny? The answer on this record is clearly not.").

Because plaintiffs have established neither general nor specific jurisdiction over the non-California state defendants, and because the exercise of jurisdiction would be unreasonable even were the minimum contacts of those defendants sufficient, the Court finds it lacks jurisdiction over those defendants. Accordingly, the Court must dismiss plaintiffs' challenge to the versions of the Qualifying Statute and the Model Act passed in states other than California, and focus its analysis on Cal. Health & Safety Code §§ 104555–104557 (West 1999) (California's Qualifying Statute) and Cal. Rev. & Tax.Code § 30163 (West 2000) (California's Model Act).

## B. Eleventh Amendment

The state defendants argue that the Eleventh Amendment and principles of sovereign immunity preclude suits against states and their instrumentalities, including NAAG. They also contend that the same principles bar the three claims based on California law.

■■■ The Eleventh Amendment holds that no suit may be "commenced or prosecuted against one of the United States by Citizens of another State ..." U.S. Const. amend. XI. The amendment has been interpreted to preclude the suit of a state in federal court by its own citizens. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). An exception to the general rule allows suits seeking prospective injunctive and declaratory relief when state officials are named as nominal defendants. *See Nevada v. Hall,* 440 U.S. 410, 420 n. 19, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979).

■■■ The state defendants contend that the exception does not apply in the instant case because plaintiffs seek retrospective relief, and because a judgment adverse to the states would drain their treasuries of settlement money, an eventuality the Eleventh Amendment was designed to prevent. The cases defendants cite in support of

---

alternative forum. *See Ziegler,* 64 F.3d at 474–75. Balancing this set of factors, California jurisdiction over the other states is unreasonable.

As described above, the other states have, at best, a tenuous connection to California under the terms of the MSA, making any "purposeful injection" minimal. The burden on the other states from litigating in California is substantial; even if they file briefs jointly (as they have in this litigation), they must still monitor every filing, given that they would be bound by any decision of the court if jurisdiction were found to exist. The conflict with state sovereignty is perhaps the most compelling factor—requiring the states to submit to California jurisdiction constitutes an extreme impingement on state sovereignty. Plaintiffs have characterized their suit primarily as one challenging the Qualifying Statute and Model

Act rather than the MSA. *See* Ps' Opp. to Private Ds' Mot. at 2. Not all states have passed a version of the Qualifying Statute and the Model Act. If and when such statutes are enacted, the states have a strong interest in having their own courts determine the legitimacy of the legislation. California has an interest in determining the legitimacy of the M.S.A. § and California's versions of the two related statutes, but has little interest in adjudicating disputes over other states' statutes. Numerous alternative fora exist, though each of these faces the same jurisdictional limitations as this court. The efficiency factor, unlike the others, favors jurisdiction in this court. On balance, the concerns indicating a lack of jurisdiction over other states in this forum outweigh those favoring a finding of jurisdiction.

their position are inapposite. *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), involved a damages suit stemming from personal injuries. The case analyzed whether a bistate railway created by interstate compact was entitled to Eleventh Amendment immunity. Injunctive relief was not at issue. In *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Court barred a suit "seek[ing] the award of an accrued monetary liability, which must be met from the general revenues of a State ..." *Edelman*, 415 U.S. at 664, 94 S.Ct. 1347. The Court found the requested payments amounted to "reparation for the past," which violated the Eleventh Amendment. *Id.* at 665, 94 S.Ct. 1347 (quoting *Rothstein v. Wyman*, 467 F.2d 226, 236–37 (2d Cir.1972)). In *Edelman*, the state did not challenge a lower court's ruling that enjoined the state from violating federal law. *See id.*

Neither *Hess* nor *Edelman* stands for the proposition that California's expectation of a continuing revenue stream is protected under the Eleventh Amendment, as the state defendants contend here. Plaintiffs seek from the state defendants a prospective injunction against the enforcement of the Qualifying Statute and the Model Act. This type of suit is analogous to the action found permissible in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (suit to prevent the state Attorney General from enforcing a statute that allegedly violated the Fourteenth Amendment was permissible under the Eleventh Amendment). Plaintiffs are not, as defendants argue, relying on equitable pleading to obtain damages from the states. Instead, they hope to enjoin the enforcement of two allegedly unconstitutional statutes. They may make this claim despite the strictures of the Eleventh Amendment.

■■■■ Plaintiffs are, however, barred from alleging their supplemental state law claims against the state defendants. *See Pennhurst*, 465 U.S. at 121, 104 S.Ct. 900 ("[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment.... [T]his principle applies as well to state-law claims brought into federal court under pendent jurisdiction."). Therefore, the Eleventh Amendment bars plaintiffs' claim for a violation of California's Unfair Competition Act, insofar as that claim is alleged against the California politician defendants and agency defendants.

## V

### Antitrust Claims

In their first three claims for relief, plaintiffs contend that the private defendants, the National Association of Attorneys General (NAAG), the politician defendants in their individual and official capacities, and the agency defendants violated §§ 1 and 2 of the Sherman Act[9] and §§ 4 and 16 of the Clayton Act[10] through the negotiation, implementation, and execution of the Master Settlement Agreement (MSA), the Qualifying Statutes, and those versions of the Model Act that many of the states have passed.[11]

9. Under § 1 of the Sherman Act, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1.

Section 2 of the Act provides, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." *Id.* § 2.

10. Section 4 of the Clayton Act allows victims of antitrust violations to sue in federal court and receive trebled damages and the cost of suit. *See* 15 U.S.C. § 15. Section 16 allows for injunctive relief. *See id.* § 26.

11. To the extent plaintiffs seek damages for defendants' alleged conspiracy to raise prices, they lack standing to bring such a challenge.

**1192**

Plaintiffs bring their fourth claim under the Cartwright Act, California's antitrust statute, against the private defendants, NAAG, the politician defendants in their individual and official capacities, and the agency defendants.

Both the private and state defendants argue that their agreement embodied in the MSA, as well as the Qualifying Statute, the Model Act, and the conduct incidental to their enactment, are immunized from challenge under the antitrust laws. They rely on the Noerr–Pennington doctrine and the doctrine of state action.

### A. The Noerr–Pennington Immunity Doctrine

Under the Noerr–Pennington Doctrine, private entities are immune from liability under the antitrust laws for "mere attempts to influence the passage or enforcement of laws," even if the laws they advocate would have anticompetitive effects. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.* ("Noerr"), 365 U.S. 127, 135, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act."). The doctrine is based "upon a recognition that the antitrust laws, 'tailored as they are for the business world, are not at all appropriate for application in the political arena.' " *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 380, 111 S.Ct.

1344, 113 L.Ed.2d 382 (1991) (quoting *Noerr,* 365 U.S. at 141, 81 S.Ct. 523). Noerr immunity applies to attempts to influence any branch of government. *See California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). It exists regardless of the potentially anticompetitive motivations of the private actors. *See Omni,* 499 U.S. at 380, 111 S.Ct. 1344; *Pennington,* 381 U.S. at 670, 85 S.Ct. 1585.

The Noerr–Pennington doctrine admits of one exception.[12] Parties are not immunized for their petitioning conduct if such conduct "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr,* 365 U.S. at 144, 81 S.Ct. 523; *see also Omni,* 499 U.S. at 380, 111 S.Ct. 1344 ("The 'sham' exception to Noerr encompasses situations in which persons use the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon."). The Supreme Court has articulated a two-part test to determine the existence of "sham" litigation. First, such suits must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.* ("PREI"), 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). If and only if that threshold is met, the court looks to the second part of the test: whether the suit demonstrates evidence of a subjective intent to use governmental process to interfere with a competitor's business. *See id.* In the Ninth Circuit, a

Under *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), a plaintiff seeking such damages must be a direct purchaser of the products at issue. *See Illinois Brick,* 431 U.S. at 736, 97 S.Ct. 2061. Plaintiffs argue that they are suing as competitors rather than customers, but competitors lack standing to bring a suit for conspiracy to raise prices. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 582–83, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**12.** Plaintiffs imply that another exception to the doctrine might exist when the government acts as a commercial entity rather than a sovereign (though they primarily use this argument with respect to the state action doctrine, discussed below). No such "commercial exception" exists to the Noerr–Pennington doctrine. *See In re Airport Car Rental Antitrust Litigation,* 693 F.2d 84, 88 (9th Cir. 1982) ("There is no commercial exception to Noerr–Pennington.").

plaintiff alleging the sham exception must include specific allegations explaining why the exception should apply; "[c]onclusory allegations are not sufficient to strip a defendant's activities of Noerr–Pennington protection." *Oregon Natural Resources Council v. Mohla*, 944 F.2d 531, 533 (9th Cir.1991).

■ Under the Noerr–Pennington doctrine, the private defendants are clearly immune for their activities involved with the negotiation, execution, and attempts to implement the MSA, the Qualifying Statute, and the Model Act. Indeed, such conduct is precisely the type of activity the doctrine was intended to protect. *See Hise v. Philip Morris Inc.*, 46 F.Supp.2d 1201, 1206 (N.D.Okla.1999) (tobacco companies' efforts to influence public officials to settle lawsuits through M.S.A. § immunized from Sherman Act under Noerr–Pennington; MSA not a sham); *Forces Action Project*, 2000 WL 20977, at *8 (N.D.Cal. Jan.5, 2000) (defendant states and tobacco companies' action in negotiating and entering into M.S.A. § immunized from suit under Noerr–Pennington).

The M.S.A. § is a settlement between tobacco product manufacturers and the Attorneys General of 46 states, the District of Columbia, and five territories. *See* FAC Exh. D at S–1 to S–26. The parties agreed to the M.S.A. § terms "to avoid the further expense, delay, inconvenience, burden and uncertainty of continued litigation (including appeals from any verdicts)." *Id.* at 2. The state governments, specifically, sought to "achieve ... significant funding for the advancement of public health, the implementation of important tobacco-related public health measures, including the enforcement of the mandates and restrictions related to such measures, as well as funding for a national [f]oundation dedicated to significantly reducing the use of [t]obacco [p]roducts by [y]outh."*Id.* One court termed the settlement "one of the most significant civil settlements in the nation's history." *Forces Action Project*, 2000 WL 20977, at *9. Plaintiff has not alleged, and indeed could not seriously allege, that the M.S.A. § is a sham. Far from an objectively baseless attempt to harm its competitors through the abuse of governmental process, the M.S.A. § reflects a genuine, ultimately successful attempt to settle extensive current and potential litigation with the states. All claims premised on the illegality of the M.S.A. § under the antitrust laws must accordingly be dismissed with prejudice.

Other courts have reached the same conclusion. In *Hise v. Philip Morris, Inc.*, 46 F.Supp.2d 1201 (N.D.Okla.1999), *aff'd mem.*, 2000 WL 192892 (10th Cir. Feb.17, 2000), an antitrust challenge to the M.S.A. § brought by consumers, the court found that because the M.S.A. § was not a sham it was immunized from antitrust attack; accordingly, the court granted summary judgment in favor of the tobacco companies. In *Forces Action Project LLC v. California*, 2000 WL 20977 (N.D.Cal. Jan.5, 2000), the court dismissed a suit by tobacco consumers challenging the MSA, finding that in the absence of any allegation that the M.S.A. § was a sham, the state and tobacco company defendants' actions in negotiating and entering into the M.S.A. § was immunized from suit under Noerr–Pennington. Finally, in *A.D. Bedell Wholesale Co. v. Philip Morris, Inc.*, 104 F.Supp.2d 501 (W.D.Pa.2000), a suit, like the instant case, brought by wholesalers challenging the M.S.A. § under the Sherman Act, the court held that the M.S.A. § was immune from antitrust challenge and dismissed plaintiff's horizontal conspiracy and monopoly claims.

Plaintiffs essentially concede that Noerr immunity exists for the M.S.A. § itself, but allege antitrust violations based on the various Qualifying Statutes, versions of the Model Act, trademark litigation, and anticompetitive conduct of the private defendants dating from "the early to mid

**1194**

1990s." FAC ¶¶ 236, 263–265.[13] To the extent plaintiffs include challenges to the Qualifying Statutes and Model Act versions as part of their antitrust claims, as well as the methods used to obtain passage of those statutes, those claims cannot survive a motion to dismiss for the same reason plaintiffs' challenge to the M.S.A. § fails. Unethical and deceptive conduct is immune from antitrust liability when it is incidental to an attempt to obtain governmental action. *See Noerr*, 365 U.S. at 140–42, 81 S.Ct. 523; *Omni*, 499 U.S. at 383–84, 111 S.Ct. 1344.

Plaintiffs' argument that Noerr–Pennington immunity should not attach is unconvincing, as none of the cases they cite in support of their contention is applicable to the instant dispute. *Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n ("SCTLA")*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990), stands for the proposition that a boycott against the government in an attempt to secure higher wages does not receive *Noerr* immunity. The Supreme Court distinguished that case from *Noerr* by noting that "the boycott was the *means* by which respondents sought to obtain favorable legislation." *SCTLA*, 493 U.S. at 425, 110 S.Ct. 768. As one commentary explains the law in this area, "Notwithstanding their illegal conduct, the defendants are not liable for injury resulting from the government's ac-

tions. Thus, courts distinguish the harm caused directly by the private parties from that caused by the government itself." 1 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 202(c) at 163 (rev. ed.1997). Here, it is precisely the effects of the MSA, the Qualifying Statute and the Model Act that plaintiffs find objectionable. Because plaintiffs have not alleged that the OCDs were boycotting the government in order to exact any concessions—indeed, such a claim would be nonsensical in the context of cigarette manufacturers—*SCTLA* is inapplicable to the instant case.[14]

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), is equally unhelpful. *Allied Tube* involved a challenge to the allegedly anticompetitive activities employed to influence the standard-setting process of a private professional association. The Court found that Noerr immunity did not attach because "the restraint is imposed by persons unaccountable to the public and without official authority …" *Id.* at 501–02, 108 S.Ct. 1931. In the instant case, of course, the MSA, the Qualifying Statute, and the Model Act—the primary objects of plaintiffs' complaint—are the result of active negotiations between accountable public officials and the tobacco companies.

---

13. Plaintiffs contend that the private defendants' other allegedly anticompetitive activities should render their actions with respect to the M.S.A. § unprotected. Relying on *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), they argue that "acts which are themselves legal lose that character when they become constituent elements of an unlawful scheme." Ps' Opp. to Private Ds at 9. That case's applicability to the instant case is dubious. As the Supreme Court pointed out in *Pennington*, *Continental Ore* involved a purchasing agent of an American corporation, not a public official. When a public official was involved, the *Pennington* Court rejected *Continental Ore* in favor of the doctrine enunciated in *Noerr*: "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate com-

petition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Pennington*, 381 U.S. at 670, 85 S.Ct. 1585.

14. Another case plaintiffs' counsel relied on at oral argument, *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240 (9th Cir.1982), is likewise unavailing. As Judge Alarcon explained, the conduct at issue there was not intended to influence governmental action. *See Clipper Exxpress*, 690 F.2d at 1253. Moreover, to the extent the case discusses the sham exception to Noerr–Pennington, it preceded the Supreme Court's definitive statement of the sham exception pleading requirements, *PREI*, by more than a decade.

*In re Brand Name Prescription Drugs Antitrust Litigation,* 186 F.3d 781 (7th Cir.1999), is likewise inapplicable in the context of the instant dispute. That case held that Noerr–Pennington "applies when [anticompetitive] action is the consequence of legislation or other governmental action, not when it is the means for obtaining such action." *Brand Name,* 186 F.3d at 789. This proposition does not conflict with any of the preceding analysis. Plaintiffs object to the allegedly anticompetitive results of the MSA, Qualifying Statute, and Model Act. Under the entire body of case law interpreting Noerr–Pennington, the statutes are immune from an antitrust attack.

*B. The State Action Immunity Doctrine*

■ Defendants also challenge the antitrust claims under the state action doctrine. In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court held that when a state exercises legislative authority in creating a regulation with anticompetitive effects, neither the state nor private actors acting at the direction of the state are liable for antitrust violations. *See Parker,* 317 U.S. at 350–52, 63 S.Ct. 307. For the doctrine to apply, the state must act as a sovereign, rather than as a "participant in a private agreement or combination by others for restraint of trade." *Id.* at 351–52, 63 S.Ct. 307; *see also Omni,* 499 U.S. at 374–75, 111 S.Ct. 1344 ("[I]mmunity does not necessarily obtain where the State acts not in a regulatory capacity but as a commercial participant in a given market.").[15] Moreover, the *Parker* court found that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Parker,* 317 U.S. at 351, 63 S.Ct. 307. Instead, the anticompetitive

conduct "must be compelled by direction of the State acting as a sovereign," not merely prompted by state action, to be immunized under the state action doctrine. *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 791, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

■ The state immunity doctrine was further refined in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (*"Midcal"*). In *Midcal,* the Supreme Court clarified that *Parker* requires states to meet two conditions before antitrust immunity will attach: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *Midcal,* 445 U.S. at 105, 100 S.Ct. 937 (quoting *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)). This clearly articulated state policy may be inferred "if suppression of competition is the 'foreseeable result' of what the statute authorizes." *Omni,* 499 U.S. at 372–73, 111 S.Ct. 1344 (quoting *Hallie v. Eau Claire,* 471 U.S. 34, 42, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985)). Under *Midcal,* a state "may displace competition with active state supervision if the displacement is both intended by the State and implemented in its specific details. Actual state involvement, not deference to private pricefixing arrangements under the general auspices of state law, is the precondition for immunity from federal law." *Federal Trade Comm'n v. Ticor Title Ins. Co.,* 504 U.S. 621, 633, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992).

The test to determine sufficient state involvement as sovereign is unnecessary

---

**15.** The state defendants note that this "market participant" exception—which has never been found in a Supreme Court case, as plaintiffs' counsel acknowledged at oral argument—might no longer be good law given the Supreme Court's recent decisions in *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219,

144 L.Ed.2d 605 (1999), and *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), severely limiting Congress's authority to subject states to private suit. While the argument has undeniable force, determination of the issue is not necessary for the resolution of this matter.

when the state legislature or state supreme court acts directly. As the Supreme Court has explained:

> Closer analysis is required when the activity at issue is not directly that of the legislature or supreme court, but is carried out by others pursuant to state authorization.... When the conduct is that of the sovereign itself, on the other hand, the danger of unauthorized restraint of trade does not arise. Where the conduct at issue is in fact that of the state legislature or supreme court, we need not address the issues of 'clear articulation' and 'active supervision.'

*Hoover v. Ronwin,* 466 U.S. 558, 568–69, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984).

■ Though the *Hoover* court did not have occasion to address the issue of executive immunity under the state action doctrine, the Ninth Circuit has held that state executives and executive agencies "are entitled to Parker immunity for actions taken pursuant to their constitutional or statutory authority, regardless of whether these particular actions or their anticompetitive effects were contemplated by the legislature." *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.,* 810 F.2d 869, 876 (9th Cir.1987). The regulated private parties are also immune from antitrust liability. "Parker immunity exempts state action, not merely state actors.... To hold otherwise ... would allow the Parker doctrine to be circumvented by artful pleading." *Id.* at 878, 810 F.2d 869.

■ Under *Hoover* and *Charley's Taxi,* the state action doctrine clearly applies in the instant case to immunize the private defendants and state defendants from antitrust liability. The M.S.A. § was negotiated by the states' attorneys general and approved by the state courts, and thus cannot be violative of the antitrust laws. To the extent the complaint challenges the

states' passage of the Qualifying Statutes or versions of the Model Act, these statutes cannot create antitrust liability because they were direct legislative activity, immunized as state action. The analysis conducted in *Midcal* and its progeny is a tool to determine whether the state is sufficiently involved in overseeing a particular policy. Direct legislative action renders such analysis superfluous.[16] *See Hoover,* 466 U.S. at 568–69, 104 S.Ct. 1989. Another court has reached precisely this conclusion. *See A.D. Bedell,* 104 F.Supp.2d at –— ——, slip op. at 11–12 (activities related to negotiation, execution and implementation of M.S.A. § held immune under the state action doctrine; *Midcal* analysis found unnecessary to the determination).

As the parties agree, interpretation of the Cartwright Act, California's antitrust statute, tracks that of the federal antitrust legislation. *See Blank v. Kirwan,* 39 Cal.3d 311, 320, 216 Cal.Rptr. 718, 703 P.2d 58 (1985) ("In interpreting the Cartwright Act, we properly look to the Sherman Act and cases construing it."); *Marin County Bd. of Realtors, Inc. v. Palsson,* 16 Cal.3d 920, 925, 130 Cal.Rptr. 1, 549 P.2d 833 (1976). Because defendants are immune from antitrust liability under federal law, they are likewise immune from liability under the Cartwright Act.

### C. Generalized Antitrust Conspiracy

In response to defendants' motions to dismiss, plaintiffs shifted the focus of their allegations. While the FAC primarily challenges the MSA, the Qualifying Statute, and the Model Act, *see, e.g.,* FAC ¶ 1 ("Plaintiffs seek to invalidate the Master Settlement Agreement ..."), plaintiffs have argued subsequently that their principal challenge was to defendants' history of anticompetitive acts, of which the passage of the statutes is merely the latest

---

**16.** At oral argument, plaintiffs cited *324 Liquor Corp. v. Duffy,* 479 U.S. 335, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987); *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.,* 111 F.3d 1427 (9th Cir.1996); and *Knudsen Corp.* *v. Nevada State Dairy Comm'n,* 676 F.2d 374 (9th Cir.1982) in support of their position. Because all of these cases use a *Midcal* analysis, they are irrelevant to the instant dispute.

example. They base this contention on a brief section of the FAC, ¶¶ 241–268, alleging that the OCDs have committed various acts since the early 1990s that constitute an overall conspiracy to eliminate plaintiffs as competitors. Plaintiffs allege that the OCDs engaged in false and threatening communications with customers to restrict the market for repatriate cigarettes, *see* FAC ¶¶ 243, 247–62, which amounted to a "horizontal boycott and concerted refusal to deal with Plaintiffs," *id.* ¶ 246. This section of the FAC also alleges that the OCDs filed a number of trademark actions to injure repatriators, without regard to the merits of these actions, and publicized the suits through various media. *See id.* ¶¶ 263–68.

Plaintiffs' argument that their lawsuit is directed against "the ongoing group boycott ... commencing in 1990[and] culminating in the execution of the Master Settlement agreement," Ps' Opp. to Private Ds at 13, cannot save them from the inevitability of the Noerr analysis. The statute of limitations for Sherman Act violations is four years. *See* 15 U.S.C. § 15b. Plaintiffs cannot rely on immunized conduct from 1998, when the M.S.A. § was signed, to bootstrap claims of allegedly illegal conduct occurring beyond the statute of limitations. Moreover, no amount of colorful pleading can obscure the fact that plaintiffs' challenge is, in fact, to the MSA, the Qualifying Statute and the Model Act, all of which are clearly immunized, as are the actions incidental to their passage.

Plaintiffs' contention that the trademark actions defendants brought against them and other vendors of repatriated cigarettes "without regard to the merits for the purpose of injuring market rivals, irrespective of their outcome" must be stricken. *Id.* ¶¶ 263–265. Even if plaintiffs had standing to bring a claim based on these suits— a dubious proposition at best, given that plaintiffs' only connection to the challenged trademark actions is that *one* of them was named as a defendant in *one* of the suits— this set of claims could not survive dismissal. Litigation is among the petitioning activities protected under Noerr–Pennington. As explained above, an allegation that such actions qualify for the sham exception must allege that the suits are objectively baseless and subjectively brought with an intent to harm a competitor through the use of the government process itself. *See PREI,* 508 U.S. at 60–61, 113 S.Ct. 1920. Plaintiffs have made no such allegations here.[17]

# VI

## Constitutional Claims

The FAC challenges the MSA, the Qualifying Statutes, and the state versions of the Model Act on a number of constitutional grounds.[18] The complaint alleges that the statutes violate the Interstate Compact Clause (claim 6), the prohibition against bills of attainder (claim 7), the Commerce Clause (claims 8 and 9), the Import–Export Clause (claims 10 and 11), the Supremacy Clause (claims 12 and 13), the First Amendment (claim 14), the Equal Protection Clause (claims 15 and 16), and the Due Process Clause (claims 17 and 18).

### A. Interstate Compact Clause

■■ In claim 6 of the FAC, Plaintiffs allege that the M.S.A. § and the Qualifying Statute are interstate compacts imposing a "nationwide quasi 'tax'" in violation of the Interstate Compact Clause.[19] FAC

---

17. Nor could they, in light of the fact that the private defendants have secured preliminary injunctions against the vendors of repatriated cigarettes in two of the suits and survived motions to dismiss in two others.

18. The private defendants correctly note that, given their private status, no constitutional case or controversy exists as applied to them.

19. The allegations in this section of the complaint are broadly worded, encompassing violations of the Commerce Clause, the Supremacy Clause, the Equal Protection Clause, and the Due Process Clauses as well. While plaintiffs also allege that the Model Act "impermissibly burdens interstate commerce," FAC ¶ 380, the FAC does not mention the Model Act in the context of the Interstate

¶¶ 379–89. The Interstate Compact Clause forbids any state from "enter[ing] into any Agreement or Compact with another State" without congressional consent. U.S. Const. art. I, § 10, cl. 3.[20] It is well established that this clause is not to be applied to all potential agreements between states. *See, e.g., United States Steel Corp. v. Multistate Tax Comm'n,* 434 U.S. 452, 468, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978); *Virginia v. Tennessee,* 148 U.S. 503, 517–18, 13 S.Ct. 728, 37 L.Ed. 537 (1893) ("There are many matters upon which different states may agree that can in no respect concern the United States."). Instead, the Compact Clause only applies to "any combination tending to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United States." *United States Steel,* 434 U.S. at 468, 98 S.Ct. 799 (quoting *Virginia,* 148 U.S. at 519, 13 S.Ct. 728); *see also Northeast Bancorp, Inc. v. Board of Governors,* 472 U.S. 159, 175–76, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985); *New Hampshire v. Maine,* 426 U.S. 363, 369, 96 S.Ct. 2113, 48 L.Ed.2d 701 (1976).

■■ The touchstone of a Compact Clause inquiry is therefore "whether the Compact enhances state power quoad the National Government." *United States Steel,* 434 U.S. at 473, 98 S.Ct. 799; *New York v. Trans World Airlines,* 728 F.Supp. 162, 182–83 (S.D.N.Y.1989). Plaintiffs allege that the MSA, the Qualifying Statute, and the Model Act violate the clause because "it [sic] surrenders state sovereignty to the M.S.A. § and constitutes a multistate compact to displace Congress' authority to regulate commerce in the whole of the United States." FAC ¶ 376(F). They base this claim on an argument that

the MSA, the Qualifying Statute, and the Model Act together encroach on federal power to regulate both interstate commerce and international trade.[21]

As in *Northeast Bancorp,* the pleadings do not allege "how the statutes in question either enhance the political power of the [participating states] at the expense of other States or have an 'impact on our federal structure.'" *Northeast Bancorp,* 472 U.S. at 176, 105 S.Ct. 2545 (quoting *United States Steel,* 434 U.S. at 473, 98 S.Ct. 799). Each participating state could have independently settled its litigation with the participating manufacturers and enacted both the Qualifying Statute and the Model Act. As was the case in *United States Steel,* the M.S.A. § "does not purport to authorize the member States to exercise any powers they could not exercise in its absence." *United States Steel,* 434 U.S. at 473, 98 S.Ct. 799; *see also Trans World Airlines,* 728 F.Supp. at 183, 728 F.Supp. 162. The fact that the states acted collectively to settle their dispute with the participating manufacturers, in the absence of an encroachment on federal power, does not create a violation of the Interstate Compact Clause.

### B. Bill of Attainder

■■ In claim 7 of the FAC, plaintiffs allege that the Qualifying Statute violates the constitutional prohibition against bills of attainder. *See* U.S. Const. art. I § 10 cl. 1 ("No State shall ... pass any Bill of Attainder ..."). A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group,* 468 U.S. 841, 846–47, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984) (quoting

---

Compact Clause until the final paragraph of the claim, in which plaintiffs allege, "[T]he MSA, Qualifying Statute and Model Act constitute an Interstate Compact which has not been approved by Congress ..." *Id.* ¶ 389.

**20.** In keeping with its finding that it lacks jurisdiction over the non-California state de-

fendants, the Court will analyze the Interstate Compact Clause claim as it applies to California.

**21.** Neither the Commerce Clause nor the Supremacy Clause argument has merit, as explained below. *See* §§ VIC and E, *infra.*

*Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977)). "Only clearest proof suffices to establish unconstitutionality of a statute" under a bill of attainder analysis. *Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 83, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); *Kerr–McGee Chemical Corp. v. Edgar*, 837 F.Supp. 927, 935 (N.D.Ill.1993). To make out a bill of attainder violation, a plaintiff must meet three requirements: "Specification of the affected persons, punishment, and lack of a judicial trial." *United States v. Munsterman*, 177 F.3d 1139, 1141 (9th Cir.1999) (quoting *Selective Serv. Sys.*, 468 U.S. at 847, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984)). Plaintiffs have met neither the specificity nor the punishment prong of the test.

 To meet the specification requirement, a claimant must show more than that the challenged law "merely designates a properly general characteristic." *Munsterman*, 177 F.3d at 1142 (quoting Laurence H. Tribe, *American Constitutional Law* § 10–4 at 643 (2d ed.1988)). Instead, "[h]ow the class is designated and what purposes the law furthers govern the specificity analysis." *Munsterman*, 177 F.3d at 1142.

 The Qualifying Statute does not contain the requisite specificity. The statute applies to "Tobacco Product Manufacturers," defined as an entity that "manufactures cigarettes anywhere that such manufacturer intends to be sold in the United States ... [or] is the first purchaser anywhere for resale in the United States of cigarettes manufactured anywhere that the manufacturer does not intend to be sold in the United States ..." Application of the statute depends entirely on an entity's prospective choice of conduct. The law is "reasonably calculated to achieve a nonpunitive purpose"—closing the loophole in the M.S.A. § to ensure the promotion of public health and payment of smoking-related costs. *See Premium To-*

*bacco Stores*, 51 F.Supp.2d at 1107 (D.Colo.1999). A broader reading of the bill of attainder clause such as plaintiffs propose here would convert the clause into "a variant of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals." *Nixon*, 433 U.S. at 471, 97 S.Ct. 2777. Such was clearly not the intent of the Framers of the Constitution.

An additional reason plaintiffs' claim fails is that the Qualifying Statute does not impose "punishment" under any reasonable interpretation of that term. As the Supreme Court has explained, "Forbidden legislative punishment is not involved merely because the Act imposes burdensome consequences. Rather, we must inquire further whether [the legislature] 'inflict(ed) punishment' within the constitutional proscription against bills of attainder." *Nixon*, 433 U.S. at 472–73, 97 S.Ct. 2777.

The Supreme Court has developed three tests to determine whether a particular statute inflicts punishment: the historical test, the functional test, and the legislative motivation test. *See Selective Service Sys.*, 468 U.S. at 852, 104 S.Ct. 3348; *Nixon*, 433 U.S. at 473–80, 97 S.Ct. 2777. Under the historical test, courts inquire whether the legislative enactment meets the historical meaning of punishment— "deprivations and disabilities so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably have been held to fall within the proscription" against bills of attainder. *Nixon*, 433 U.S. at 473, 97 S.Ct. 2777. Such punishments included death, "imprisonment, banishment, and the punitive confiscation of property by the sovereign." *Id.* at 474, 97 S.Ct. 2777 (citations omitted). The statutory scheme created by the Qualifying Statute, in which a tobacco product manufacturer either joins the M.S.A. § or pays into an escrow account,[22] does not even

---

22. Money in the escrow account, if not used

to pay a judgment or settlement, is returned

arguably qualify as one of these types of punishment.

Under the functional test, courts inquire whether the challenged law "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Id.* at 475–76, 97 S.Ct. 2777. For the reasons cited above, the Qualifying Statute, on its face, furthers the nonpunitive legislative purposes enumerated in the MSA. Other courts have found similar payment requirements constitutional under bill of attainder clause analysis. *See Kerr–McGee,* 837 F.Supp. at 936 (statute requiring payment into safety fund for future clean-up costs in absence of an agreement with the government found non-punitive and thus not a bill of attainder). Plaintiffs allege that the "punishment" inflicted under the Qualifying Statute is the requirement that NPMs "deposit huge sums of money into an escrow fund in the same amount OCDs pay for past liability." Ps' Opp. to Private Ds' Mot. at 39. Such payments are based on the amount of plaintiffs' sales. As such, they are legitimately targeted to nonpunitive purposes, notwithstanding plaintiffs' characterization of the payment amount.

The final test examines the legislative history of the statute in question. Plaintiffs do not—nor could they—allege that the legislative history of the Qualifying Statute indicates any impermissible intent to punish.

Because the FAC has not sufficiently alleged that the Qualifying Statute contains the requisite specificity for a bill of attainder claim, and cannot allege that the statute is impermissibly punitive under any of the tests routinely employed by the courts, plaintiffs' bill of attainder claim is dismissed.

### C. Commerce Clause

Plaintiffs' FAC contends in claims 8 and 9 that the states have violated the Commerce Clause through passage of the Qualifying Statute (claim 8) and the Model Act

(claim 9). Plaintiffs allege that the Qualifying Statute is a "national quasi tax upon interstate commerce" and discriminates between in-state and out-of-state goods. FAC ¶ 395. They also claim that the Model Act violates the Commerce Clause by discriminating between goods based on their place of origin and by "impos[ing] a ban on 'imported' goods, thus regulating international trade, without consent of Congress." *Id.* ¶¶ 400, 403. Neither claim can survive defendants' motion to dismiss.

 The Commerce Clause provides that Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States ..." The dormant, or negative, aspect of the Commerce Clause prevents states from enacting regulations that benefit in-state interests at the expense of their out-of-state competitors. *See West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 192, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). In analyzing a state regulation to determine if it violates the Commerce Clause, courts employ a two-part test. *See Oregon Waste Sys., Inc. v. Dep't of Environmental Quality,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *Pacific Northwest Venison Producers v. Smitch,* 20 F.3d 1008, 1012 (9th Cir.1994). First, the court determines whether the regulation discriminates on its face in favor of in-state interests. Discrimination, in this context, "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys.,* 511 U.S. at 99, 114 S.Ct. 1345. Such a statute will be upheld only if "the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *West Lynn Creamery,* 512 U.S. at 192–93, 114 S.Ct. 2205 (quoting *New Energy Co. v. Limbach,* 486 U.S. 269, 273–74, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)); *Kleenwell Biohazard Waste & General Ecology Con-*

with interest. *See* M.S.A. § Exh. T at T–4.

*sultants, Inc. v. Nelson*, 48 F.3d 391, 395 (9th Cir.1995).

Second, if the regulation at issue has only an incidental effect on interstate commerce, courts will uphold it "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Kleenwell*, 48 F.3d at 396. Courts have not interpreted the Commerce Clause to prevent states from passing legislation to benefit the health and safety of their citizens. *See Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443–44, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); *Premium Tobacco*, 51 F.Supp.2d at 1104. Therefore, health and safety regulations are generally upheld, even when they impose an incidental burden on interstate commerce.

■ Neither the Qualifying Statute nor the Model Act facially discriminates against out-of-state goods. The Qualifying Statute requires that NPMs pay into an escrow account a certain amount per pack of cigarettes sold in order to pay for any potential future liability. This requirement applies equally to in-state, out-of-state, and foreign tobacco product manufacturers; the statute makes no distinction based on cigarette origin. Plaintiffs allege that under the terms of the *Pike* test, the "burden" imposed by the Qualifying Statute clearly exceeds the putative local benefits. However, the FAC does not support this argument. While plaintiffs argue that the statute forces them to pay more per carton of cigarettes and pass the excess cost along to consumers, they do not explain how such a cost burdens interstate commerce, or even why the entire extra cost must be passed on in this fashion.[23]

Moreover, they argue that "[t]he purported benefits of providing a source for state recovery of health care costs is legally deficient because Plaintiffs' [sic] are immune from products liability." Ps' Opp. to Private Ds' Mot. at 31. This contention is based on California Civil Code § 1714.45, which does indeed preclude products liability actions brought by consumers who know that a product is inherently unsafe, *see id.* § (a), but "does not apply to, and never applied to, an action brought by a public entity to recover the value of benefits provided to individuals injured by a tobacco-related illness caused by the tortious conduct of a tobacco company or its successor in interest," *id.* § (e). The parties dispute whether § (e) applies to plaintiffs, but in passing the Qualifying Statute, the California legislature implicitly assumed that it does. No court has held otherwise. On this record, the Court must defer to the legislature's own interpretation. Plaintiffs cannot argue that the amount of escrow payments are disproportional to the amount of potential liability they face, since any funds not used to pay judgments or settlements after 25 years are returned to NPMs with interest.

Finally, the Court notes that plaintiffs' claim that a less discriminatory alternative to the Qualifying Statute exists—the requirement of insurance or a bond—is unavailing. The state legislatures enacting the Qualifying Statute have determined that the requirement of a per-pack contribution to the escrow fund is the most desirable method of ensuring the existence of a sufficient fund to pay out any future liability. "Even in the context of dormant Commerce Clause analysis, the Supreme Court has frequently admonished that courts should not 'second-guess the empirical judgments of lawmakers concerning

---

**23.** Plaintiffs allege that defendants are increasing prices by more than the amount needed to cover the payments into the M.S.A. § fund. *See* FAC ¶ 215 ("The price increases were far greater than required to fund the settlement proceeds, with an additional 26.2¢ per pack added purely to increase the profits

of the Original Corporate Defendants."). If plaintiffs' business is based in part on being able to undercut the OCDs' prices, presumably they would still be able to do this under the Qualifying Statute by only increasing their prices to cover the Escrow Fund payments, without adding the alleged premium.

the utility of legislation.' " *Pacific Northwest Venison*, 20 F.3d at 1017 (quoting *CTS Corp. v. Dynamics Corp.*, 481 U.S. 69, 92, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987)). The existence of some conceivable alternative is insufficient to create a Commerce Clause violation where none exists under the traditional indicia.

▪▪▪ The Model Act likewise survives plaintiffs' Commerce Clause challenge. When a complaint alleges discrimination against foreign commerce, the court must consider two additional factors: the possibility that a foreign entity will face multiple taxation, and the potential for impairment of federal uniformity in an area where such uniformity is essential. *See Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 446, 448, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979). An example of the latter factor is an issue that "may implicate 'matters of concern to the [whole] nation . . . such as the potential for international retaliation.' " *Pacific Northwest Venison*, 20 F.3d at 1014 (quoting *Kraft General Foods v. Iowa Dep't of Revenue*, 505 U.S. 71, 79, 112 S.Ct. 2365, 120 L.Ed.2d 59 (1992)). When examined in light of the traditional Commerce Clause factors and the additional ones required in the context of foreign commerce, the Model Act cannot be found to discriminate in favor of in-state interests. *See Premium Tobacco*, 51 F.Supp.2d at 1105 (rejecting a Commerce Clause challenge to Colorado's version of the Model Act and noting that the relevant statutes "evenhandedly regulate all retailers from selling repatriated cigarettes in Colorado without regard to whether the retailer is in-state, out-of-state, a party to, or not party to, the MSA").

As explained above, the Model Act does not disadvantage out-of-state or foreign retailers of cigarettes. A ban on the importation of a particular type of good is not a per se violation of the Commerce Clause with respect to foreign goods. *See Northwest Venison*, 20 F.3d at 1012 ("An import ban that simply effectuates a complete ban on commerce in certain items is not discriminatory, as long as the ban on commerce does not make distinctions based on the origin of the items."). Here, the ban applies even-handedly to all cigarette distributors, preventing the sale of cigarettes labeled " 'For Export Only', 'U.S. Tax Exempt', 'For Use Outside U.S.,' " or with similar wording. *See* M.S.A. § Exh. U § 3(c). The statute applies regardless of whether such cigarettes originate from an in-state, out-of-state, or foreign source.

Under the *Pike* standard, plaintiffs' complaint cannot withstand dismissal, because plaintiffs have not alleged a cognizable claim that the Model Act's burden on interstate or foreign commerce is "clearly excessive" in relation to the statute's putative benefits. The local benefits from the Model Act include closure of a loophole to increase the effectiveness of the MSA, which in turn is intended to "reduce [y]outh smoking, to promote the public health and to secure monetary payments to the Settling States." MSA at 2; *see also Premium Tobacco*, 51 F.Supp.2d at 1107. Incidental burdens on commerce "may be unavoidable when a State legislates to safeguard the health and safety of its people." *See Kleenwell*, 48 F.3d at 399 (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623–24, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)). Plaintiffs must demonstrate that the burden is clearly excessive compared to the local benefits; their conclusory claims to the contrary, and their exclusive citation to cases involving economic protectionism of local industries, *see, e.g., Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984); *Starlight Sugar Inc. v. Soto*, 909 F.Supp. 853 (D.P.R.1995), are not sufficient to withstand dismissal. Furthermore, as discussed in greater detail in the context of the Supremacy Clause challenge, plaintiffs have not alleged how the Model Act interferes with federal uniformity where such

uniformity is essential. The Model Act reflects a legislative determination that the health and safety of its citizens would be benefitted by a decrease in the supply of available cigarettes. Such a determination is unquestionably permissible; it is not the province of the courts to second-guess the wisdom of the legislature's choice.[24]

### D. Import–Export Clause

The FAC also alleges that the state defendants have violated the Import–Export Clause of the Constitution through passage of the Qualifying Statute (claim 10) and the Model Act (claim 11). Under the Constitution, "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws ..." U.S. Const. art. I § 10 cl. 2. The clause was included in the Constitution to remedy the balkanization among states under the Articles of Confederation that allowed seaboard states to regulate their commercial relations with foreign countries independently, siphon off a primary source of federal revenue, and exact tribute for goods passing through their borders to inland states. *See Michelin Tire Corp. v. Wages,* 423 U.S. 276, 285–86, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976). Not all state assessments having an incidental effect on foreign commerce are prohibited under the Import–Export Clause. "Although the constitution forbids the states from exploiting their position to the detriment of foreign commerce, they are entitled to compensation for services or property they provide," such as police and fire protection afforded to the imported goods while in the importing state. *Western Oil and Gas Ass'n,* 726 F.2d 1340, 1345 (9th Cir.1984); *see also Michelin Tire,* 423 U.S. at 289, 96 S.Ct. 535.

Plaintiffs allege that the Qualifying Statute "singles out 'import' goods for assessment," and that the Model Act "by banning 'import' goods imposes impermissible imposts or duties on those 'import' goods." FAC ¶¶ 407, 411. Both claims must be dismissed.

■ As described above, the Qualifying Statute is not a tax on imports. Instead, it requires all NPMs to pay into an escrow account based on their volume of sales. The Qualifying Statute bears none of the hallmarks cited by the Supreme Court as indicative of an illegal impost or duty under the clause: interference with foreign relations, diversion of revenue from the federal government, or creation of "an impediment that severely hamper[s] commerce or constitute[s] a form of tribute by seaboard States to the disadvantage of the other States." *Michelin Tire,* 423 U.S. at 285–86, 96 S.Ct. 535. Instead, the Qualifying Statute seeks a contribution to an escrow account, the contents of which ultimately will go to paying out liability claims or will be refunded. The contribution is calibrated to the volume of sales and, by extension, to the amount of health risk created by the tobacco product manufacturer's activities. Despite plaintiffs' contention that "the Escrow [Qualifying] Statute ... single[s] out imported goods and their distributors for unfavorable treatment," this is simply not a correct reading of the statute. Ps' Opp. to Private Ds' Mot. at 34. All NPMs are subjected to the requirement under the Qualifying Statute, regardless of their location. The Import–Export Clause does not afford importers of foreign tobacco products preferred status, exempting them from regulations to which competitors dealing exclusively in domestic goods are subject. *See Michelin Tire,* 423 U.S. at 286–87, 96 S.Ct. 535. The Import–Export Clause, in short, is in no way implicated by the statute.

---

**24.** The court in *Premium Tobacco* came to a similar conclusion. Judge Kane found that the purpose of the M.S.A. § was to raise the retail price of cigarettes to decrease the quantity of sales, especially to minors, in further-ance of the state's health and safety goals. *See Premium Tobacco,* 51 F.Supp.2d at 1105, 1106. The court analyzed the Model Act as a means to eliminate a loophole in the M.S.A. § and further these goals. *See id.*

■ The Model Act creates a blanket prohibition on a particular type of goods, regardless of whether manufactured domestically or abroad. By its terms, therefore, it does not implicate any imposts or duties that would involve the application of the Import–Export Clause. The clause has never been interpreted to encompass a ban on a particular type of good, and the Court will not initiate such a trend.[25]

### E. Supremacy Clause

The FAC alleges that the Qualifying Statute (claim 12) and the Model Act (claim 13) violate the Supremacy Clause, which states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI cl. 2. Plaintiffs contend that the set of federal laws and regulations relating to tobacco indicate the federal government's intent to preempt the field, rendering both statutes violative of the Supremacy Clause. *See* FAC ¶¶ 412–419. Moreover, the FAC alleges that both statutes infringe on the federal government's exclusive power to regulate international trade. *See id.* ¶¶ 414, 419.

**25.** Plaintiff cites *Michelin Tire,* 423 U.S. at 288, 96 S.Ct. 535, and *Wheeling–Pittsburgh Steel,* 26 F.Supp.2d at 1026, for the contrary proposition. *Michelin Tire* does not address the issue. *Wheeling–Pittsburgh Steel* cites the Import–Export Clause as an example of the Framers' intent to vest exclusive power to regulate foreign trade with the federal government; nothing in this analysis contradicts that elementary proposition.

**26.** The other statutes mentioned in the FAC are: 27 C.F.R. § 290.185 (regulation requiring cigarettes exported from the United States to be marked "for use outside U.S." or other words to that effect); 19 C.F.R. §§ 11.1 to

■ The Supremacy Clause "invalidates state laws that interfere with, or are contrary to, federal law." *Hillsborough County v. Automated Medical Lab., Inc.,* 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (internal quotations omitted). Federal law supersedes state law when Congress expressly states an intention to preempt state law or when the federal regulatory scheme is so comprehensive that it implies congressional intent to preclude supplemental state regulation. *See id.* at 713, 105 S.Ct. 2371. Even in the absence of complete preemption, state laws violate the Supremacy Clause when they conflict with federal regulations. *See id.; Lindsey v. Tacoma–Pierce County Health Dep't,* 195 F.3d 1065, 1069 (9th Cir.1999). Federal regulations as well as federal statutes may preempt state legislation. *See id.* State legislation of health and safety matters is presumed constitutional under the Supremacy Clause; this presumption may only be overcome by a showing that preemption "was the clear and manifest purpose of Congress." *Id.* at 715–16, 105 S.Ct. 2371 (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)).

Plaintiffs contend that both statutes are preempted by the Federal Cigarette Labeling and Advertising Act ("FCLAA"), 15 U.S.C. §§ 1331–1341; 26 U.S.C. §§ 5704 and 5754 (statutes regulating the repatriation of tobacco products); and a number of other statutes and regulations.[26] *See* FAC ¶¶ 413, 418.

11.3 (regulations governing the importation of foreign tobacco products); 19 U.S.C. § 81c (statute governing the exemption from customs laws of merchandise brought into a foreign trade zone); and 15 U.S.C. § 1202 (statute governing exemptions to laws concerning flammable fabrics). The FAC also mentions various unspecified federal laws and regulations, including Federal Trade Commission regulations, antitrust laws, and regulations of U.S. Customs, the Department of Health and Human Services, the Centers for Disease Control, the Internal Revenue Service, and the Bureau of Alcohol, Tobacco and Firearms. *See* FAC ¶¶ 413, 418. Another court has described this collection as "a litany of federal

■ When federal legislation includes an explicit preemption statute, the wording of the preemption statute—not the substantive provisions of the legislation—determines the scope of preemption. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *Lindsey*, 195 F.3d at 1069. Under the preemption section of the FCLAA, states may not require cigarette manufacturers to place any statements on cigarette packages "relating to smoking and health" other than those required under the FCLAA, and may not impose any additional regulations of cigarette advertising or promotion. 15 U.S.C. § 1334. Thus, the Supremacy Clause inquiry, insofar as plaintiffs allege preemption by the FCLAA, must determine whether the Qualifying Statute and Model Act involve requirements for cigarette packaging, advertising, or promotion.

■ The Qualifying Statute requires tobacco product manufacturers to join the M.S.A. § or pay into an escrow account to cover potential future liability. It does not have any connection whatsoever with cigarette packaging, advertising, or promotion. To the extent plaintiffs object to the voluntary advertising restrictions to which signatories to the M.S.A. § have agreed, they lack standing to challenge these provisions. Moreover, the restrictions are not legislatively required, as were those found violative of the Supremacy Clause in *Lindsey*. *See Lindsey*, 195 F.3d at 1070. Rather, the restrictions under the M.S.A. § are part of a voluntary agreement. Similarly, the Model Act bans repatriated cigarettes, but such a blanket prohibition does not even arguably implicate cigarette advertising or promotion. *See Premium Tobacco*, 51 F.Supp.2d at 1106 ("The state's ability to declare packages of cigarettes marked in compliance with the federal packaging requirements as contraband is not intru-

sive on the advertising or promotion of these cigarettes and is therefore not precluded by the Supremacy Clause.").

■ Similarly, plaintiffs contend that 26 U.S.C. §§ 5704 and 5754, statutes that regulate the repatriation of tobacco products, directly conflict with the Model Act. Section 5754 requires importers of repatriated tobacco products to follow section 5704(d), which in turn concerns taxation of repatriated cigarette products. *See* 26 U.S.C. §§ 5704, 5754. Together, the statutes specify the procedure that must be followed if repatriated products are imported; neither purports, either facially or by implication, to guarantee that such products may be imported. Thus, they do not conflict with the Model Act, and do not create a violation of the Supremacy Clause.

None of the other statutes and regulations mentioned in the FAC contain a preemption clause. However, plaintiffs argue that the sheer extent of regulation concerning the import and export of tobacco products indicates congressional intent to preempt the field. *See* Ps' Opp. to Private Ds' Mot. at 37 ("Plaintiff, when it 'repatriates' American made cigarettes back into the country, is subject to a scheme of federal regulations overseen by federal regulatory agencies, that is so comprehensive, it can only be reasonably inferred that Congress intended to completely occupy the field in determining the legality of 'repatriating' imported cigarettes."). The Court cannot agree with plaintiffs' characterization. The Supreme Court has held, "[W]e will seldom infer, solely from the comprehensiveness of federal regulations, an intent to pre-empt in its entirety a field related to health and safety." *Hillsborough County*, 471 U.S. at 718, 105 S.Ct. 2371. A plaintiff alleging a Supremacy Clause violation must therefore "present a showing of implicit pre-emption of the

---

statutes regulating the foreign purchase of American made cigarettes, repatriation of these cigarettes under customs law, the federal guidelines assuring compliance with ciga-

rette labeling requirements, and the payment of an excise tax on the repatriated cigarettes." *Premium Tobacco*, 51 F.Supp.2d at 1106.

whole field ... that is strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulations." *Id.* at 715, 105 S.Ct. 2371. Plaintiffs' litany of regulations, standing alone and without an explanation of alleged preemptive effect, is insufficient to create such a presumption. *See Premium Tobacco,* 51 F.Supp.2d at 1106 (rejecting gray market cigarette distributors' Supremacy Clause challenge to Colorado's statute banning repatriated cigarettes).

Plaintiffs could also show preemption through the direct conflict between a federal statute or regulation and the Qualifying Statute or the Model Act. *See Hillsborough County,* 471 U.S. at 713, 105 S.Ct. 2371. The federal laws and regulations plaintiffs cite, detailing the necessary procedures an importer of tobacco products must follow, do not conflict with either challenged statute. As such, their Supremacy Clause claims fail on this ground as well. *See Premium Tobacco,* 51 F.Supp.2d at 1106.

Finally, plaintiffs allege that the restrictions the statutes place on imports of foreign goods intrudes upon the federal government's exclusive power to regulate international trade. Analysis of this argument tracks the analysis of the Commerce Clause as it relates to international trade. For the reasons stated above, neither statute infringes on the exclusive federal power to control international trade. Accordingly, plaintiffs have stated no Supremacy Clause claim.

### F. First Amendment

Claim 14 of the FAC alleges that the state defendants have violated plaintiffs' free speech rights through passage of the Qualifying Statute. According to plaintiffs, the M.S.A. § allows tax deductions for participants' payments to the settlement fund, while payments to the escrow account under the Qualifying Statute are not tax-deductible. Plaintiffs contend that the differential tax consequences essentially punish tobacco product manufacturers for refusing to join the M.S.A. § and submit to its "restrictions on truthful, nonmisleading advertising." FAC ¶ 423.

Plaintiffs are correct that the government may not condition a tax exemption on the renunciation of an individual's right to free speech. *See Speiser v. Randall,* 357 U.S. 513, 518, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). This constitutional requirement is based on the notion that the same government power that requires the renunciation also determines whether the individual qualifies for the tax exemption. *See id.* (tax exemption only given if the taxpayer signs a loyalty oath placed on the tax form). However, the Qualifying Statute does not force plaintiffs to make an analogous, constitutionally-prohibited choice. Instead, determination of whether the payments may be deducted turns on the ownership of the funds. Under the MSA, the funds are given to the government, and are non-refundable. Pursuant to federal and state tax codes, such funds are tax-deductible. Conversely, tobacco product manufacturers subject to the Qualifying Statute who do not join the M.S.A. § retain ownership over the funds deposited in the escrow account (until such time as the funds are needed to satisfy a judgment or settlement); retained ownership triggers different tax consequences under the federal and state tax codes. *See Commissioner v. Lincoln Sav. & Loan Ass'n,* 403 U.S. 345, 354–56, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971). The scheme created by the M.S.A. § and the Qualifying Statute, in which deductibility of funds is determined by the generally applicable tax codes and based on possession, is wholly unlike the situation in *Speiser,* where "[t]he denial [of tax exemption] is frankly aimed at the suppression of dangerous ideas." *Speiser,* 357 U.S. at 518, 78 S.Ct. 1332.

Because the speech restrictions at issue in the M.S.A. § are wholly separate from the tax consequences stemming from a tobacco distributor's choice to participate

in the M.S.A. § or subject itself to the terms of the Qualifying Statute, plaintiffs' First Amendment claim must be dismissed.

### G. Equal Protection Clause

The FAC alleges that the state defendants have violated the Equal Protection Clause through the Qualifying Statute (claim 15) and the Model Act (claim 16). Plaintiffs contend that the Qualifying Statute discriminates against them unreasonably by requiring distributors of repatriated cigarettes to pay into an escrow account when domestic distributors and wholesalers are not subjected to such payments. *See* FAC ¶¶ 427–430.[27] They argue that the Model Act is similarly violative of the Equal Protection Clause because it permits the sale of some American-made and foreign cigarettes but bans the sale of repatriated cigarettes. *See id.* ¶¶ 433–436.

Plaintiffs do not contend that they are a suspect class entitled to heightened scrutiny under the Equal Protection Clause. Instead, they argue that neither challenged statute is rationally related to any legitimate government objective. *See id.* ¶¶ 430, 436. Both claims fail as a matter of law.

 Under the rational basis test, parties challenging a statute on equal protection grounds "cannot prevail so long as ... the question [of rationality] is at least debatable." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). The Qualifying Statute is indisputably rationally related to a permissible state objective. The Statute requires that all tobacco manufacturers, including distributors of repatriated cigarettes, join the M.S.A. § or pay into an escrow account to fund potential liability claims. The state legislature has determined that such a statute is necessary to guarantee a source of recovery for judgments and settlements in potential future suits against tobacco product manufacturers electing not to participate in the MSA. *See* M.S.A. § Exh. T at T–1 ("It would be contrary to the policy of the State if tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the State will have an eventual source of recovery from them if they are proven to have acted culpably."). Plaintiffs claim that the Qualifying Statute is not rationally related to its stated purpose—ensuring that the state can recover for any future liability judgment—because they are immune from any products liability action. As noted above, that proposition is incorrect because Cal. Civ.Code § 1714.45(e) provides that tobacco companies, or their successors in interest, are not immune from actions brought by a public entity. *See* Cal. Civ.Code § 1714.45(e).[28]

Plaintiffs also argue that the Qualifying Statute "forces plaintiffs to raise prices [, but] does not restrict OCDs or SPMs from selling alternative cheaper brands of cigarettes.... [F]orcing plaintiffs to charge more for their cigarettes ... cannot be rationally tied to a decrease in smoking when alternative cheap cigarettes are obviously available." Ps' Opp. to Private Ds' Mot. at 41–42. Because all tobacco product manufacturers must pay into the settlement fund or an escrow account, all will need to raise prices to cover the additional expense. Plaintiffs' argument that some manufacturers will suffer from this additional cost imposition more than others fails to state an equal protection claim. Moreover, reducing the total quantity of

---

**27.** As noted above, the Qualifying Statute applies to all manufacturers as well as distributors of tobacco products intended for foreign distribution. It thus seeks to ensure that all "first sellers" of tobacco products within a state "pay their way," by contributing to the state fund or the escrow fund.

**28.** Plaintiffs cannot establish that they are statutorily immune from suit, much less that the legislature acted irrationally in concluding otherwise.

inexpensive cigarettes available within the state is a rational response to a known health threat.

■ The Model Act likewise survives rational basis scrutiny. The statute reflects a legislative decision to reduce the supply of cigarettes in a given state. As the *Premium Tobacco* court explained, the Model Act is a necessary adjunct to the MSA, "effectively closing what the state believes to be a loophole in the MSA," and the M.S.A. § is rationally related to permissible health and safety goals. *Premium Tobacco*, 51 F.Supp.2d at 1107. Once these goals have been articulated, it is not the province of the federal courts to inquire into the efficacy of the legislature's chosen measures. *See id.*

### H. Due Process Clause

The FAC alleges that the Qualifying Statute (claim 17) and the Model Act (claim 18) violate the Due Process Clause. Plaintiffs contend that the Qualifying Statute deprives them of due process because it has a retroactive effect, requiring payment into an escrow fund for cigarettes plaintiffs purchased prior to the statute's enactment. *See* FAC ¶¶ 440–446. They also argue that the rate of escrow payments was established without notice or hearing. *See id.* ¶ 446(D).

■ The fact that legislation has upset an individual's business expectations does not make application of the law impermissibly retrospective. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 269, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law.") (citations omitted); *Samaniego–Meraz v. INS*, 53 F.3d 254, 256 (9th Cir.1995) ("Neither is a law retroactive simply because it upsets expectations based in a prior law."). Instead, "[r]etroactivity depends on whether the new provision attaches new legal conse-

quences to events completed before its enactment." *Samaniego–Meraz*, 53 F.3d at 256; *see also Miller v. Florida*, 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). Under both the Qualifying Statute and the Model Act, no new *legal* consequences attach to plaintiffs' activities prior to the date of enactment. The Qualifying Statute might require plaintiffs to charge more for the cigarettes they have in stock to recoup their escrow payments, *see* FAC ¶¶ 444–445, but this imposition of an additional business expense does not amount to retroactive application of the statute. Similarly, the Model Act by its terms goes into effect on the day of its enactment. *See* FAC Exh. F at § 6 ("This act ... takes effect immediately."). No sales of repatriated cigarettes are punishable before that date. To the extent that plaintiffs object to the confounding of their business expectations, such expectations are not granted blanket protection by the Due Process Clause. *See Samaniego–Meraz*, 53 F.3d at 256.

■ Plaintiffs also object to the lack of notice and an opportunity to be heard prior to enactment of the two statutes. *See* FAC ¶¶ 439, 449. Such objections are not sufficient to prevent dismissal. Both statutes were legislatively enacted. "When the action complained of is legislative in nature, due process is satisfied when the legislative body performs its responsibilities in the normal manner prescribed by law." *Halverson v. Skagit County*, 42 F.3d 1257, 1260 (9th Cir.1994) (citation omitted). Lacking an allegation of an abnormality in the legislative process, plaintiffs' due process claims on this score must be dismissed.

### VII

### State Claims

■ The final three claims of the FAC allege violations of California's Unfair Competition Act (Cal. Bus. & Prof.Code §§ 17200–17209) and the state's prohibitions against intentional interference with

prospective business advantage and trade libel. A district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it had original jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). The Court has dismissed all of plaintiffs' federal claims. Accordingly, it declines to exercise supplemental jurisdiction over plaintiffs' state law claims.

## VIII

### Conclusion

Because defendants are immune from plaintiffs' antitrust challenges to the MSA, the Qualifying Statute, and the Model Act, and because plaintiffs have failed to state a cognizable claim founded on a constitutional violation, the Court hereby *dismisses* all of plaintiffs' federal claims, *with prejudice. See Doe v. United States*, 58 F.3d 494, 497 (9th Cir.1995) (finding dismissal with prejudice proper if "the pleading could not possibly be cured by the allegation of other facts"); *Albrecht v. Lund*, 845 F.2d 193, 195–96 (9th Cir.1988) (when defect would not be repaired through amendment, refusal of leave to amend is proper).

IT IS SO ORDERED.